IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

         Plaintiff,

  and

CATHERINE COPELLO and ALLISON
KENNEDY,

    Plaintiffs-Intervenors,

      v.

CUSTOM COMPANIES, INC., CUSTOM
EXECUTIVE GROUP, INC. and CDN
LOGISTICS,

     Defendants.

Case Nos. 02 C 3768
        03 C 2293

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

The Equal Employment Opportunity Commission (hereinafter, "EEOC") and Plaintiff-Interveners Catherine Copello (hereinafter "Copello") and Allison Kennedy (hereinafter "Kennedy")(hereinafter, "Interveners")(collectively, the "Plaintiffs") filed suit against Defendants Custom Companies Inc. (hereinafter, "Custom") and Custom Executive Group (hereinafter, "CEG") (collectively, the "Defendants") alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000 *et seq.* A jury found for the Plaintiffs on all but one count (Kimberly Fritkin's sexual harassment claim). Both Plaintiffs and Defendants filed post-trial motions. Due to the sheer number of motions (and issues) to be

decided, the facts pertinent to each issue will be recited within the Court's analysis of that issue, rather than presented here.

## I. <u>JUDGMENT AS A MATTER OF LAW</u>

### A. Custom Executive Group As a Proper Party

Defendants move for summary judgment and/or judgment as a matter of law as to CEG, arguing that Plaintiffs failed to fulfill a statutory prerequisite for suing CEG by failing to include CEG in the only EEOC charge. (Defendants move for summary judgment because this Court has reserved for itself the decision as to the status of CEG and Custom.) Copello's EEOC charge, the only EEOC charge filed by a plaintiff remaining in the case at trial, did not mention CEG.

A plaintiff may add an unnamed defendant if that party had adequate notice of the charge and had been given the opportunity to participate in conciliation proceedings. *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 905 (7th Cir. 1981). Plaintiffs meet the *Eggleston* requirements. First, CEG was aware of the EEOC charge. CEG and Custom share an owner, a President, Vice-Presidents of Operations and Sales, and human resources officers. *See Eggleston,* 657 F.2d at 906 (overlap of board members between named and unnamed parties indicate that unnamed party was aware of EEOC charge). CEG employees Terry Klonowski (hereinafter, "Klonowski") and Tom Boyle (hereinafter, "Boyle") testified that they were aware of the charge. The charge alleges that Copello complained about "degrading sexist comments" to Perry Mandera (hereinafter, "Mandera"), CEG's President and owner. Second,

CEG had sufficient opportunity to participate in conciliation. "If a party has a close relationship with a named respondent . . . and has actual notice of the EEOC charge . . . to the extent that [the unnamed party] could have participated in conciliation efforts, the [unnamed party] should not be heard to cry 'foul' when later made a defendant in a suit." *Eggleston*, 657 F.2d at 907 (quoting *Stevenson v. International Paper Co.*, 432 F.Supp. 390, 397-98 (W.D. La. 1977)). As in *Eggleston*, CEG's and Custom's close relationship necessarily suggests that CEG had sufficient opportunity to conciliate. Thus, Defendants' motion is denied.

Defendants have also argued that CEG is not a single employer with Custom. This argument will be addressed in a later section.

## B. Kimberly Fritkin's Retaliation Claim

Defendants have moved for a directed verdict and/or judgment as a matter of law as to Kimberly Fritkin's (hereinafter, "Fritkin") retaliation claim because that claim was brought only as a piggyback (to Corinne Miller's claim) in the 2003 case. Fritkin filed no timely EEOC charge of her own. The EEOC counters that it brought the claim upon meeting Title VII's prerequisites to filing suit based on an administrative determination that a class of individuals was subjected to retaliation by Defendants.

The EEOC may seek relief on behalf of individuals who have not filed charges if it finds "reasonable cause to believe a valid charge was filed in a timely manner." *E.E.O.C. v. Harvey L. Walner & Associates*, 91 F.3d 963 (7th Cir. 1996). No Seventh Circuit

authority requires that the EEOC win on the merits of the timely filed charge. Indeed, "any violations that the EEOC ascertains in the course of a reasonable investigation . . . are actionable." *E.E.O.C. v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005). Defendants' only case, *Bost v. Federal Express Corp.*, 372 F.3d 1233, 1241 (11th Cir. 2004) is inapposite as it involves a suit filed by a plaintiff (on behalf of himself and a class) before filing the requisite EEOC charge rather than a suit filed by the EEOC on behalf of a class of individuals. *See, generally, Caterpillar*, 409 F.3d at 832 (distinguishing cases brought by the EEOC and those brought by private individuals). Thus, Fritkin's claim is not barred.

Next, Defendants move for judgment as a matter of law on Fritkin's retaliation claim, arguing that a legitimate lawsuit cannot be the basis for a retaliation claim. This Court has previously held that Fritkin met the second requirement of the *McDonnell Douglas* test because she suffered an adverse action by being sued and being forced to incur the expenses of hiring attorneys. *U.S. E.E.O.C. v. Custom Companies, Inc.,* 2006 WL 3087104 (N.D. Ill Oct. 26, 2006); *E.E.O.C. v. Custom Companies, Inc.,* 2004 WL 1638224 (N.D. Ill. July 21, 2004). Based on the evidence at trial, a reasonable jury could have determined that Defendants' lawsuit was retaliatory; Defendants ignored Fritkin's purported debt until after the EEOC filed suit and filed the suit only after Defendants failed to have Fritkin removed from the class. Custom has never filed a similar suit against any of its previous sales representatives. *See, Equal Employment*

*Opportunity Commission v. Levi Strauss & Co.*, 515 F.Supp. 640, 644 (N.D. Ill. 1981)("those suits initiated in state court in good faith . . . are not necessarily violations of the Act . . . the Commission must demonstrate that the action was filed for improper, *i.e.*, retaliatory, purposes").

## II.  DAMAGES

### A.  Damages Awarded by the Jury

The following damages were awarded by the jury:

|  |  | Compensatory | Punitive |
|---|---|---|---|
| Catherine Copello | (harassment) | $ 100,000 | $ 1,000,000 |
|  | (retaliation) | $ 60,000 | $ 300,000 |
| Allison Kennedy | (harassment) | $ 50,000 | $ 500,000 |
|  | (retaliation) | $ 35,000 | $ 150,000 |
| Kimberly Fritkin | (harassment) | --- | --- |
|  | (retaliation) | --- | $ 100,000 |
|  | (attorney fees) | $ 60,000 |  |

### B.  Compensatory and Punitive Damages

#### 1.  *§ 1981a Statutory Caps*

The parties agree that the compensatory and punitive damages are limited by the statutory caps set forth in § 1981a.

##### a.  *Caps Apply Per Plaintiff, Per Suit*

The parties dispute whether the caps apply per plaintiff or per claim.  In *Smith v. Chicago School Reform Bd. of Trustees*, 165 F.3d 1142 (7th Cir. 1999), the Seventh Circuit considered whether a Plaintiff could apply the caps on a per-claim basis, thus recovering up to the cap maximum on each of three racial discrimination counts.

The Seventh Circuit held that the caps applied on a per-lawsuit, per-plaintiff basis: "the unit of accounting is the litigant, not the legal theory." In response to the Plaintiff's argument that this result would lead creative lawyers to file multiple suits, the Court responded:

> "The same-transaction rule developed in the law of preclusion holds out more prospect of giving a practical answer to that question than does any other approach we can envisage. It permits persons who have been victimized multiple times (and separately injured by each discriminatory episode) to recover more than persons who have suffered only once, which is as it should be; but it also recognizes that a single discriminatory 'transaction' may include many nasty events."

Plaintiffs argue that because the EEOC brought two separate class lawsuits, one for harassment (Case No. 02 C 3768) and one for retaliation (Case No. 03 C 2293), the caps should apply per plaintiff and per lawsuit. The cases were combined only for purposes of judicial efficiency. The Seventh Circuit specifically acknowledged that plaintiffs might split their claims into separate suits to take advantage of more than one cap in *Smith*; it responded that so long as the second suit did not run afoul of claim preclusion considerations, a single plaintiff could take advantage of two statutory caps in this manner. The two suits here arose out of different transactions, and thus, Plaintiffs have not run afoul of claim preclusion principles. As such, this Court will apply a per suit, per plaintiff cap.

### b. *Relevant Time Periods*

The relevant time periods in a Title VII action are the time periods in which discriminatory conduct occurred. *See* 42 U.S.C.

§ 1981(b); *Komorowski v. Townline Mini-Mart and Restaurant*, 162 F.3d 962, 965 (7th Cir. 1998). Plaintiffs suggest that the relevant years are 1994-1999 (Copello was harassed between 1994 and 1999), 1998-1999 (Copello was retaliatorily denied quotes in 1998 and terminated in 1999), 1998 (Kennedy was harassed and retaliatorily terminated in 1998), and 2004 until the present (Fritkin was retaliatorily sued in 2004 until the present). Defendants contend that the relevant time period for Fritkin is only 2004 because the suit was initiated in 2004, and that no retaliatory actions were taken thereafter. Although Defendants did not undertake any new retaliatory actions after 2004, their initial retaliatory action was ongoing. As such, this Court will consider 1994-1999, 1998-1999, 1998, and 2004 until the present as the relevant periods.

### c. Number of Employees

To determine the number of employees employed by a company for the purposes of the § 1981a caps, a court must determine the number of employees employed in each of twenty or more calendar weeks in the relevant period. 42 U.S.C. § 1981a(b)(3). Plaintiffs assert that Defendants employed more than 200, but fewer than 501 employees, in each of the relevant time periods, which places the applicable statutory caps at $200,000. 42 U.S.C. § 1981(b). Defendants assert that they employed fewer than 101 employees in 1999 (a $50,000 cap), slightly more than 101 employees in 1998 (a $100,000 cap), and less than 100 employees in 2004 (a $50,000 cap). *Id.* Plaintiffs' and Defendants' differing numbers are due to a dispute over which

employees count:  Plaintiffs assert that this Court should count (1) Custom employees, (2) CEG employees, and (3) Custom and CEG's leased employees, whereas Defendants argue that this Court should consider only Custom employees.

### i.  Custom Companies Employees

The parties agree that this Court should count the employees employed by Custom Companies.  Custom Companies employed 109 employees for a twenty-week period in 1998, 72 employees for a twenty-week period in 1999, and 91 employees for a twenty-week period between 2004 and 2006.

### ii.  CEG Employees

Defendants assert that this Court cannot consider employees of CEG when determining the caps because CEG is not a single employer with Custom under the test set forth in *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999).  *Papa* considered whether a parent corporation's employees could be counted so that the aggregate number of employees for the plaintiff's employer and the parent corporation exceeded the minimum of fourteen required for recovery under Title VII.  *Id.*  The Seventh Circuit set out three specific situations in which a company may be considered a single employer with another: (1) where traditional "piercing the veil" conditions exist; (2) where an enterprise has split itself up for the express purpose of avoiding liability under the discrimination laws; or (3) where the second corporation has directed the complained of act, practice, or policy. Defendants assert that Plaintiffs cannot meet these tests, primarily

because CEG is not Custom's parent corporation.  Plaintiffs assert that the companies need not be in a parent-subsidiary relationship for *Papa* to apply, and that Custom and CEG meet the first and third *Papa* prongs.

While *Papa* clearly involved a parent-subsidiary relationship, the Seventh Circuit has applied its test to situations involving affiliated corporations.  *Worth v. Tyer*, 276 F.3d 249, 259-260 (7th Cir. 2001); *see also, Shannon v. Hotel Employees and Restaurant Employees Intern' Union*, 2003 WL 1338457 (N.D. Ill. Mar. 18, 2003). In *Worth*, the plaintiff was employed by one corporation that was closely affiliated with four other corporations.  Plaintiffs sought to aggregate the various corporations' employees, and the Seventh Circuit applied the *Papa* test to find that the corporations did not meet any of the prongs.  *Id.* 276 F.3d at 259-260 (finding one affiliated corporation liable as a successor in interest).  Clearly, the *Papa* test applies to this case, despite the fact that CEG is not Custom's parent corporation.

Plaintiffs argue that it can meet the first and third situations identified in *Papa*.  Because this Court finds that Plaintiff meets the third of the *Papa* requirements, it will not consider the first. *See Shannon*, 2003 WL 1338457 at *5.  Under this test, Plaintiffs must demonstrate that CEG directed the complained of act, policy, and procedure.  *Id.*  CEG employed all executives and management-level personnel and at Custom, including harassers Tom Kolzow (hereinafter,

"Kolzow") and Mike Maher (hereinafter, "Maher"). Klonowski, who is responsible for Custom's compliance with Title VII, is a CEG employee. Mandera, who was involved in the decisions to retaliatorily terminate Copello and Kennedy and to sue Fritkin, is an employee of CEG. Thus, this Court finds that CEG is properly a single employer with Custom.

As such, this Court must determine the number of employees employed by CEG during 1994-1999, 1998-1999, 1998, and 2004 to the present. The EEOC's and Plaintiff-Intervenors' proposed numbers do not agree; the EEOC claims that CEG employed 19 in 1998, 18 in 1999, and 22 from 2004 to 2006 whereas Plaintiff-Intervenors claim that CEG employed 23 at all relevant times. The disagreement appears to stem from reliance on different sources – the EEOC cites to CEG's payroll records whereas Plaintiff-Intervenors cite to Steve Laue's Rule 30(b)(6) testimony. This Court recognizes that the discrepancies will not affect the outcome and thus employs the lower of the figures. (See table below).

### iii.  Leased Employees

Lastly, Defendants assert that this Court should not consider leased employees when determining the cap amounts. Between 1995 and 2006, Defendants leased employees from a series of companies, including LeaseCo, Innovative Benefits Concepts (hereinafter, "IBC"), and Transportation Personnel Services, Inc. (hereinafter, "TPS"). These employees were not paid by Custom or CEG, but Plaintiffs assert

that they should be counted because Defendants exercised sufficient control over them.

As an initial matter, Defendants argue that employees of LeaseCo, IBC, and TPS should not be counted because these entities were not mentioned in Copello's EEOC charge, the complaints, or the joint pre-trial order, and because Plaintiffs seek to raise a new theory of liability against these entities. Plaintiffs are not seeking to assert liability against these companies. Instead, Plaintiffs merely argue that these entities' employees were sufficiently controlled by Defendants that they should count for the statutory caps. As such, these entities need not have been mentioned in the EEOC charge, complaints, or pre-trial order. Defendants' reliance on *Parrish v. Solecito*, 280 F.Supp. 2d 145 (S.D.N.Y. 2003), for the proposition that Plaintiffs attempt to aggregate the leased employees too late, is inappropriate. *Parrish* involved a Plaintiff who belatedly attempted to aggregate employees of several separate entities merely because these entities were owned by the same individual, there was some overlap between employees of the various entities, and the entities shared certain support services. Here, rather, Plaintiffs seek to aggregate employees who, for all intents and purposes, worked for Custom.

Next, Defendants argue that LeaseCo, IBC, and TPS are not joint employers with Custom, the Seventh Circuit no longer espouses the joint employer theory, and, even if Plaintiffs successfully asserted a joint employer theory, the employees of the companies cannot be

aggregated. Defendants correctly point out that the Seventh Circuit cases cited by Plaintiffs concern joint employer theories where the plaintiff, usually a temporary employee, is officially employed by one employer, the temporary agency, and seeks to sue the employer where she was placed by the agency (the placement employer, not the temporary agency, engaged in discrimination). *See, e.g., Piano v. Ameritech/SBC*, 2003 WL 260337 (N.D. Ill. Feb. 5, 2003); *Kerr v. WGN Continental Broadcasting Co.*, 229 F.Supp. 2d 880, 885-86 (N.D. Ill. 2002). Plaintiffs here seek a joint employer theory not in order to sue the discriminator, but in order to arrive at a more accurate count of the employees who worked for the discriminator. Although the validity of a joint employer theory is in doubt, the Seventh Circuit has not held that aggregation is improper. *See Piano,* 2003 WL 260337; *U.S. E.E.O.C. v. Foster Wheeler Const., Inc.*, 1999 WL 515524 (N.D. Ill. July 14, 1999).

Several other jurisdictions have allowed aggregation of the kind sought here (or suggested that it would be allowed in the proper circumstances). *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002)(considering whether temporary workers were sufficiently controlled as to be aggregated); *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994)(hotel and contractor were properly considered joint employers and that aggregation of employees was appropriate); *Burdett v. Abrasive Engineering & Technology, Inc.*, 989 F.Supp. 1107 (D. Kan. 1997)(plaintiff could aggregate employees of staffing agency, as long

as those employees were staffed with the employer and employer exercised sufficient control over the employees); *Stone v. Indiana Postal & Federal Employees Credit Union*, 2005 WL 2347226 at *2-4 (N.D. Ind. Sept. 25, 2005)(plaintiff attempts to aggregate committee members based on argument that they are like temporary employees, but fails because committee members are not employees at all); *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193 (N.Y. 2005)(suggesting that a plaintiff may aggregate employees of a joint employer, but only if the "loaned" employees are jointly employed; plaintiff did not make this showing); *EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(b)* (giving example where plaintiff sues corporation with thirteen regular employees and five temporary employees; corporation is covered by Title VII because it has eighteen employees).

This Court believes that aggregation of sufficiently controlled temporary or leased employees is the correct conclusion. Not permitting a plaintiff to aggregate sufficiently controlled temporary or leased workers would work an injustice. It would artificially deflate an employer's number of employees, thereby artificially limiting a Title VII plaintiff's recovery under the statutory caps, and in some cases, entirely precluding recovery under Title VII. If the caps exist to protect small employers from excessive liability, they necessarily equate number of employees with an employer's size and ability to pay. Whether an employer employs workers via its own payroll, or hires these employees through an employment agency or

other joint employer, it seems that these workers should count in an assessment of the employer's size and ability to pay (assuming, of course, sufficient control has been exercised by the employer over these workers).  After all, courts will look to "the conventional master-servant relationship as understood by common law agency doctrine" to determine who is an employee under Title VII because the definition of "employee" is unhelpful and circular.  *See Brown v. City of North Chicago*, 2006 WL 1840802 at *5 (N.D. Ill. June 28, 2006)(considering whether plaintiff is employee or independent contractor).  Allowing an employer to avoid increased liability simply by employing workers through a third party would distort the application of the caps.

That is not to say, however, that any or all temporary or leased employees should be aggregated.  Instead, only those workers over whom the employer has a certain amount of control should be counted.  *See Piano*, 2003 WL 260337; *Burdett*, 989 F.Supp. 1107.  In *Piano*, where a temporary employee sought to sue his placement employer, the court used a five-part test to determine if the placement employer was a joint employer with the temporary agency.  *Piano*, 2003 WL 260337 at *5 (importing the test from the independent contractor/employee context).  Thus, this Court will consider the following five factors:  "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work

place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations." *Id.* The first factor is the most important. *Id.*

LeaseCo and IBC employees were sufficiently controlled by Custom to have their employees aggregated. LeaseCo and IBC provided dispatch, dock operations, drivers, and mechanics to Custom (but primarily drivers and dock operations workers). Custom maintained control of these workers; they interviewed employees before they were placed with Custom and provided all equipment with which they worked. Custom, furthermore, supervised the employees' supervisor and provided personnel files, performance reviews, discipline, and made these employees eligible for employee of the month rewards. These employees received a Custom handbook and Custom ran their training. Although the employees were paid by LeaseCo and IBC, the employees were eligible for Custom health benefits and Custom approved salary changes. The employees worked in Custom facilities and drove trucks provided by Custom. Additionally, Terry Klonowski arranged for some LeaseCo employees to remain with Custom through IBC.

Defendants argue that LeaseCo and IBC are separate companies and provide the same services now provided to Custom by CDN Logistics. This Court has held that CDN Logistics is not a single employer with Custom and therefore granted summary judgment in its favor. LeaseCo and IBC do not "play the same role" as Defendants claim; CDN

Logistics now employs TPS to fill the role previously played by LeaseCo and IBC. LeaseCo and IBC are separate companies; they have their own phone and fax numbers, have separate business facilities from Custom, maintain their own financial and business records, and share no bank loans or credit lines with Custom. Essentially, Defendant argues that LeaseCo and IBC should be characterized as vendors, rather than joint employers (or temporary agencies), and that their employees therefore should not be aggregated. These arguments do not change the facts laid out above or that Custom asserted sufficient control over LeaseCo and IBC employees such that these employees should be aggregated. Instead, these arguments go to what Plaintiffs freely admit: that LeaseCo and IBC are separate and distinct companies from Custom.

The number of employees employed by LeaseCo and IBC and controlled by Custom appears to be in dispute between the parties. Plaintiffs suggest that the number was 100 at all relevant times, drawn from a statement made during Klonowski's deposition. Defendants contest this number in their sur reply (but not in their response) but offer no suggestion as to the proper number. Prior to very recently, Defendants had steadfastly refused to turn over records from which the proper number could be extrapolated, arguing that the leased employees could not be aggregated and that the records were irrelevant. This Court believes that Defendants had an obligation to do more than merely assert that Plaintiffs got it wrong. As such, this Court will deem the number to be 100.

This Court, however, does not believe that Custom had sufficient control over TPS employees such that they may be aggregated. The facts regarding TPS' relationship with CDN Logistics and Custom are somewhat sketchier than those regarding IBC's and LeaseCo's, and many of the facts important for the control test are not clear. Additionally, TPS is on a different footing with Custom because TPS employees work directly for CDN Logistics and/or Custom Global Logistics, not Custom. TPS employees received Custom employee handbooks. After IBC stopped providing employees, many of these same employees remained under TPS because either CDN Logistics or Klonowski arranged for their transition. Before TPS placed employees with CGN Logistics and/or Custom Global Logistics, they were interviewed, but it is unclear which entity interviewed them. There has been no information regarding TPS employees' eligibility for health benefits or employee of the month awards put before this Court. Furthermore, there is no information regarding approval of salary changes, discipline, or the maintaining of personnel files for these workers. The leased TPS employees are relevant only to the cap in Fritkin's retaliation claim; even if they are not aggregated, the jury's punitive award does not exceed the statutory cap. As such, the status of the TPS employees is irrelevant.

iv.  Number of Employees and Applicable Statutory Caps

Based on the foregoing, the number of employees in the relevant years of 1998, 1999, and 2004 to the present are:

|                                   | Custom | CEG | Leased | Total | Cap        |
|-----------------------------------|--------|-----|--------|-------|------------|
| Copello Retaliation (1998-99)     | 109    | 19  | 100    | 228   | $ 200,000  |
| Copello Sex Harassment (1994-1999)| 109    | 19  | 100    | 228   | $ 200,000  |
| Kennedy Retaliation (1998)        | 109    | 19  | 100    | 228   | $ 200,000  |
| Kennedy Sex Harassment (1998)     | 109    | 19  | 100    | 228   | $ 200,000  |
| Fritkin Retaliation (2004-2006)   | 91     | 22  | None   | 113   | $ 100,000  |

*See* § 1981a.

## 2. *Compensatory Damages*

Compensatory and punitive damages together must comply with the § 1981a caps. The Seventh Circuit suggests that the preferred method for reducing awards is to leave compensatory damages intact and lower punitive damages as necessary to bring the total under the cap (rather than reducing the compensatory damages or reducing both *pro rata*). *See Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004). This Court need not reduce the compensatory damages awarded by the jury, as each award is less than the applicable § 1981a statutory caps.

Defendants assert that compensatory damages should be reduced to nominal compensatory damages. Specifically, Defendants argue that compensatory damages of only $1.00 are appropriate because the Plaintiffs offered only their own self-serving testimony that they

had been emotionally troubled by events at Custom, and this testimony did not reach the requisite level of detail.

A court must give substantial deference to a jury's calculation of compensatory damages, but must also "ensure that the award is supported by competent evidence." *Farfaras v. Citizens Bank & Trust Co. of Chicago*, 2005 WL 670523 at *4 (N.D. Ill. Mar. 21, 2005). When reviewing a compensatory award, a court makes three inquiries: "whether the award is 'monstrously excessive'; whether there is no rational connection between the award and the evidence . . . ; and whether the award is roughly comparable to awards made in similar cases." *Id.*

After reviewing the record, this Court concludes that the compensatory awards are not "monstrously excessive" and are rationally related to the evidence presented. There was evidence that Copello and Kennedy were subjected to repeated sexually explicit comments and jokes as well as (in Kennedy's case) inappropriate touching by Custom and CEG employees. This behavior did not stop, despite complaints. There was also evidence that Copello and Kennedy were fired shortly after either making complaints or having a complaint made for them, and that Mandera threatened Copello that she would not work again in the industry. Additionally, both Copello and Kennedy testified to the emotional harm she suffered as a result of Defendants' actions.

Furthermore, this Court notes that the jury's awards appear internally consistent: more was understandably awarded to Copello

than to Kennedy, as Copello was subjected to the Custom environment longer. While courts do not normally consider internal consistency in determining if a compensatory award is monstrously excessive, this Court believes that the internal consistency is further proof that the award was not the "product of the jury's fevered imaginings or personal vendetta." *See, U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995).

Title VII plaintiffs are not required to present medical evidence of emotional injury. *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558 (7th Cir. 2006) at 566. If, however, the plaintiff provides the sole evidence of mental distress, he must reasonably and sufficiently explain the circumstances of his injury, and not merely make conclusory statements. *Biggs v. Village of Dupo*, 892 F.2d 1298, 1304 (7th Cir. 1990). The Seventh Circuit does not require that claims of emotional injury be supported by corroborating testimony. *Niebur v. Town of Cicero*, 212 F.Supp. 2d 790, 822 (N.D. Ill. 2002). Additionally, because "emotional damages are difficult to describe, it will often suffice to describe their causes, and appeal to the jury's understanding of what it would be like to have to endure such abuse." *Id.* Defendants argue that Copello's and Kennedy's testimony was insufficiently detailed to support the jury's award. In *Biggs,* and in *Nekolny v. Painter*, 653 F.2d 1164, 1172-73 (7th Cir. 1981), the Seventh Circuit reversed a jury's compensatory damages award because the plaintiff merely made "a single statement" that he was "depressed" or "a little despondent." *Biggs*, 892 F.2d at

1305.  Despite the fact that Plaintiffs did not present testimony from a medical expert or corroborating testimony, their testimony was sufficient to support the jury awards.  Both Copello and Kennedy testified to emotional harm in greater detail than was the case in *Biggs* or *Nekolny* and to sufficient abuse and retaliation from which the jury could infer what it would be like to suffer such abuse (as *Neibur* suggests).  Copello testified that she did not enjoy hearing sexually explicit conversations in sales meetings and felt ashamed when hearing them; that she was humiliated, afraid, embarrassed, and felt like "two cents" by the ongoing betting that she would sleep with George Wiszowaty (hereinafter, "Wiszowaty"); that she felt ashamed and embarrassed when forced to go to the Crazy House (a place of adult entertainment); that she felt "pretty worthless" and was shocked and embarrassed at golf outings that included strippers; that she felt horrified when looking at pictures from these golf outings; that she felt terrified after Kennedy was fired; that she felt nervous and uncomfortable having to listen to Wiszowaty while sitting in her cubicle; etc.  Kennedy testified that she felt that she didn't know what she was getting herself into when Kolzow referred to women as "bitches and cunts"; she was absolutely ill when going to work knowing she would have to see Maher; that she was upset and could not concentrate after Maher grabbed her on the Rockford sales call; that she did not want to go into work, but did not quit because she needed the job; that she was terrified and very scared, that she was thoroughly embarrassed when she observed Wiszowaty fondling his

girlfriend's breasts at the United Center; that she felt shattered when fired and told to leave within 15 minutes; etc. The jury was able to observe both women while they testified and apparently found their testimony to be sincere and sufficient to convince them that they merited the amounts awarded. *See Tullis v. Townley Engineering and Mfg. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001).

The awards in this case are roughly comparable to awards in other Title VII cases. *See, Lampley v. Onyx Acceptance Corp.,* 340 F.3d 478, 484 (7th Cir. 2003)(upholding $75,000 award for retaliatory discharge); *Tullis*, 243 F.3d at 1068 (upholding $80,000 award for retaliatory discharge); *Neal v. Honeywell, Inc.*, 191 F.3d 827 (7th Cir. 1999)($200,000 for emotional damages); *Farfaras*, 2005 WL 670523 (upholding $200,000 award for sexual harassment). As this Court stated in *Farfaras*, "[t]his is not a case of an isolated comment or action. Plaintiff testified that Defendants, who each held positions of power . . . harassed her on repeated occasions." 2005 WL 670523 at *4. Thus, this Court will not reduce the compensatory damages awards.

### 3. *Punitive Damages*

#### a. *Appropriateness*

As an initial matter, Defendants argue (but only in their reply brief) that Plaintiffs have not made the requisite showing for punitive damages to have been awarded. Punitive damages may be awarded in Title VII cases where the plaintiff demonstrates that his employer engaged in a discriminatory practice "with malice or

reckless indifference to the [plaintiff's] federally protected rights." *Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 535 (1999). *Kolstad* established a three-part framework for determining whether punitive awards were appropriate: the plaintiff must establish that (1) the employer acted with knowledge that its actions may have violated federal law and (2) the employees who discriminated against him are managerial agents acting within the scope of their employment; and the employer can avoid liability for punitive damages if it can show (3) that it engaged in good faith efforts to implement an anti-discrimination policy. *Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001). This Court believes that the evidence was sufficient to enable a reasonable jury to determine that Custom was recklessly indifferent to the Plaintiffs' federally protected rights.

### b. *Copello and Kennedy*

This Court must reduce the punitive damages awarded by the jury to fit within the § 1981a caps. As the Court has upheld the compensatory damages, the following reductions in the punitive damages must be made to comply with the caps:

|         |              | **Jury Award** | **Cap Compliant Award** |
|---------|--------------|----------------|-------------------------|
| Copello | (harassment) | $ 1,000,000    | $ 100,000               |
|         | (retaliation)| $   300,000    | $ 140,000               |
| Kennedy | (harassment) | $   500,000    | $ 150,000               |
|         | (retaliation)| $   150,000    | $ 150,000               |

Now, the court must determine whether the remaining punitive damage awards are excessive. *See Lust*, 383 F.3d at 589-590 (7th Cir.

2004)(first reducing punitive damages to comply with cap and then considering whether they are excessive).

One of the purposes of punitive damages in the employment discrimination context is to "dissuade defendants who are unaffected by compensatory damages from the misapprehension that they are beyond the reach of civil penalties." *Farfaras,* 433 F.3d at 567. To determine whether a punitive damage award is excessive, a court considers the following three guideposts: "(1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004)(citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)). A punitive damages award must not "exceed what is necessary to serve the objectives of deterrence and punishment." *AIC Security*, 55 F.3d at 1287.

Defendants' actions were reprehensible. There was evidence of repeated touching (in Kennedy's case), sexually explicit comments and jokes, sexual advances, and a sexually-charged atmosphere. There was also evidence that Kennedy was fired immediately after Copello complained to Klonowski about her treatment and that Defendants extensively monitored, took accounts away from, and eventually fired Copello after she complained. The harassment came from employees in positions of power over Copello and Kennedy. *See Farfaras*, 2005 WL 670523 at *5; *BMW*, 517 U.S. at 576-77.

There is, however, some disparity between the harm suffered by the plaintiff and the punitive awards. After applying the caps, the awards are not internally consistent: Kennedy receives greater punitive awards than Copello (while the reverse is true of the jury's original awards), even though Copello endured the Custom environment for four years and received greater compensatory damages. However, this Court believes that such distortion will necessarily occur where the caps are applied to awards that exceed the cap amounts. As the Seventh Circuit has stated, "[r]eflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive damages verdict so that it is proportional, in the court's view, to the defendant's wickedness." *Lampley*, 340 F.3d at486 (citing *Caudle v. Bristow Optical Co. Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000)).

A court will "not normally" disturb an award of damages at or under the statutory cap, "as this decision is largely within the province of the jury." *Fine v. Ryan Intern. Airlines*, 305 F.3d 746 (7th Cir. 2002). As such, the statutory maximum permitted by the caps is not reserved for only the most egregious cases. *Lampley,* 340 F.3d at 486. The evidence in this case supported a finding that Defendants engaged in prolonged sexual harassment (both verbal and physical) and then retaliated against Copello and Kennedy when they dared to complain. It is also possible that the jury found large punitive damages awards necessary to ensure that Defendants "sat up and took notice." *Id.* at 486.

Additionally, these awards are comparable to awards made in other cases.  *See id.* at 486 (upholding $270,000 punitive damage award); and *AIC Sec. Investigations*, 55 F.3d 1276 ($150,000 punitive award upheld).  The punitive damages (once reduced by the caps) range from $100,000 to $165,000.  Thus, this Court will not disturb the jury's punitive awards.

### c. *Fritkin*

Defendants also argue that Fritkin's punitive damage award was excessive.  Fritkin's award need not be reduced in order to comply with the statutory cap, as it was initially only $100,000.  As noted above, a court will "not normally" disturb an award of damages at or under the statutory cap, "as this decision is largely within the province of the jury." *Fine,* 305 F.3d 746.  Defendants' conduct was reprehensible; evidence was presented at trial that Defendants ignored Fritkin's alleged obligation until after Fritkin filed suit. A $100,000 award is in proportion to the harm the jury believed Fritkin suffered (the attorney's fees).  A $100,000 award also is comparable to other sexual harassment cases. *See Lampley*, 340 F.3d at 486 (upholding $270,000 punitive damage award); *AIC Sec. Investigations*, 55 F.3d 1276 ($150,000 punitive award upheld). Thus, this Court upholds the jury's punitive award.

### C.  Fritkin's Attorney Fees Award

Defendants also seek a reduction of the jury award of $60,000 for Fritkin's attorney's fees incurred in the state action.  A court may disturb a jury's damage award where there is no rational

connection between the award and the evidence. *See Trytko v. Hubbell, Inc.*, 28 F.3d 715, 727 (7th Cir. 1994). At trial, Fritkin's attorney testified that he had accumulated $32,000 of fees in defending the state court suit. The jury, however, awarded Fritkin $60,000 for attorney's fees. There appears to this Court no rational connection between the award and the evidence, and thus, the award is hereby reduced to $32,000.

### D.  Back Pay and Front Pay

#### 1.  *Back Pay*

Under Section 706(g) of Title VII, back pay relief is an important part of Title VII's objective to deter unlawful employment practices. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). Under *Albermarle*, back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making the person whole for injuries suffered through past discrimination." *Id.* at 418.

Back pay is calculated by "measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by the defendant." *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985). Back pay awards include all fringe benefits. *Hathaway v. New Dimension Center for Cosmetic Surgery*, 2006 U.S. Dist. LEXIS 6789 (N.D. Ill. 2002). This process is speculative, and therefore, the

calculation need not be precise; exactness is not expected. *Horn*, 755 F.2d at 606-08. "Ambiguities in what an employee . . . would have earned but for the discrimination should be resolved against the discriminating employer." *Steward v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976).

Liability for back pay begins at the time that the harassment causes economic injury, but may not accrue from a date more than two years prior to the filing of a charge with the Commission. When the plaintiff obtains comparable or higher paying employment, back pay terminates. *Smith v. America Service Co. of Atlanta, Inc.*, 796 F.2d 1430 (11th Cir. 1986).

In addition to their arguments regarding Copello and Kennedy's specific situations, Defendants argue that Copello and Kennedy failed to provide information regarding unemployment benefits and that their back pay awards, if any, should be reduced by any unemployment they received. It is within this Court's discretion to offset unemployment awards. *See E.E.O.C. v. O'Grady*, 857 F.2d 383, 390 (7th Cir. 1988); *Doherty v. Crow*, 2001 WL 722090 (S.D. Ind. Apr. 20, 2001). Deducting the unemployment benefits Plaintiff-Intervenors received from the amount of back pay owed to them by Defendants "provide[s] [Defendants] with a windfall in exchange for its discriminatory actions." *Hathaway v. New Dimension Center for Cosmetic Surgery*, 2006 WL 1594060 (N.D.Ill., 2006) at *3. Not deducting the benefits, conversely, confers a windfall on plaintiffs. *See Doherty*, 2001 WL 722090. As the *Doherty* court reasoned, "because

- 28 -

the employee is the victim of unlawful discrimination, he or she is 'the logical choice'" to receive the windfall. *Id.* at *16; *see also Hathaway*, 2006 WL 1594060 at *3. Thus, neither award will be offset by unemployment benefits.

Defendants also argue that in the time since they left Custom, both Copello and Kennedy have had children, and that to the extent that they were or would have been on maternity leave or other disability they should not be able to recover from Defendants. Defendants suggest that this Court reduce any award made to both Plaintiff-Intervenors by the equivalent of 12 weeks unpaid leave for these children. When determining the proper award of back pay, a court must take care not to put the plaintiff in a better position than she was before termination. *Hathaway*, 2006 WL 1594060 at *2. Plaintiff-Intervenors have not provided any information suggesting that they would not have taken twelve weeks of leave or that they had vacation time accumulated such that some of that time would have been paid. *See id.* However, Copello's submissions regarding unreimbursed medical expenses for a miscarriage on June 19, 2000 preclude the possibility that she would have needed maternity leave during her February 1, 2000 to June 31, 2000 back pay period. As such, this Court will deduct from Kennedy's back pay award the equivalent of twelve weeks of pay: $12,692.31 (based on a salary of $55,000 per year).

*a. Copello*

Copello requests back pay damages in the amount of $39,126.00, broken down as follows: (1) $3,000 in lost car allowance ($500 monthly between February 1, 2000 and July 30, 2000); (2) $1,957 in lost 401(k) contributions(between February 1, 2000 and November 17, 2006); (3) $256 in lost profit-sharing contributions (between February 1, 2000 and November 17, 2006); (4) $7,072 in lost pay due to the $5,000 reduction in her salary (between September 12, 1999 and January 31, 2000); (5) $18,066 in lost pay between February 1, 2000 and July 31, 2000; and (6) $8,775 in unreimbursed medical expenses incurred between February 1, 2000 and July 31, 2000. (This request reflects a revised request submitted by Plaintiff-Intervenors after this Court requested additional information regarding unemployment, 401(k) contributions, and severance pay). This request accounts for Copello's severance package and the fact that Copello earned more money in another job as of August 1, 2000. Defendants apparently do not object to the $3,000 in lost car allowance, the $7,072 in lost pay due to the $5,000 reduction in Copello's salary, or basing Copello's back pay award on her $45,000 salary. The lost car allowance constitutes a fringe benefit properly included in the back pay award. This Court believes that there was ample evidence at trial that the $5,000 salary reduction was retaliatory in motive; therefore, Copello should be repaid this amount for the time she was still employed by Custom and her back pay award should be calculated based on this amount. Additionally, Defendants do not object to the

$18,066 figure in lost pay, and this Court believes that this is the proper amount.

Copello also requests a total of $2,213 in lost 401(k) contributions (calculated based on Custom's matching contribution for the period ending January 19, 2000) and lost profit sharing (calculated based on Custom's contribution for the period ending January 19, 2000) between February 1, 2000 and November 17, 2006. (This figures vary dramatically from Copello's initial request for lost 401(k) contributions – approximately $22,000 over the same time period.) Copello's subsequent employment did not provide 401(k) contributions. Thus, this Court grants Copello's request for $1,638 in 401(k) contributions. This Court, however, denies Copello's request for $256 in lost profit sharing, as Copello fails to provide any indication of whether she received profit-sharing benefits in her subsequent employment.

In a supplemental request for back pay, Copello seeks an additional $8,775 in unreimbursed medical expenses incurred between February 1, 2000 and July 31, 2000. Health insurance benefits are fringe benefits properly included in a back pay award. *Hathaway*, 2006 U.S. Dist. LEXIS 6789. In order to recover for lost insurance coverage, a plaintiff must show that she either incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered under the employer's insurance program. *Kossman v. Calumet County*, 800 F.2d 697, 703-04 (7th Cir. 1986); *see also Kolovitz v. Brokers Title Ins. Co.*, 2004 WL 1199775 at *4 (N.D.

Ill. June 1, 2004)(test requires that plaintiff demonstrate *both* that she was unable to secure alternative coverage *and* incurred a medical expense). Copello has not even addressed whether she secured, attempted to secure, or attempted and failed to secure medical coverage on her own. Although Copello apparently incurred medical expenses that she paid out of pocket, she merely asserts in her brief that these would have been covered under the Custom insurance plan. Copello has made no attempt to substantiate that they would be covered by the insurance plan (even by asserting thus in her affidavit) and only now belatedly seeks reimbursement for these costs in response to the Court's request for further information regarding her unemployment, 401(k) plan, and severance package. This Court, in its discretion, denies her request for medical expenses.

Thus, this Court awards Copello $30,095.00 in back pay.

### b. Kennedy

#### i. Mitigation of Damages

A harmed party has a duty to mitigate damages by using reasonable and diligent efforts to secure other employment. 42 U.S.C. § 2000e-5(g); *Doe v. Oberweis Dairy*, 456 F.3d 704, 714 (7th Cir. 2006). Defendants have asserted an affirmative defense that Kennedy failed to mitigate her damages; therefore, Defendants bear the burden of persuasion to establish that Kennedy (1) lacked diligence in mitigating her damages and (2) with reasonable diligence, there was a reasonable chance that Kennedy might have found a comparable job. *U.S. E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990).

Plaintiff-Intervenors admit that Kennedy was not seeking a job between 2002 and 2004, and request no back pay for this period.

Defendants argue that Kennedy lacked diligence in mitigating her damages. They assert that Kennedy was voluntarily a housewife from 1999 to 2003, that she could not recall any place she interviewed between 1999-2002, that she has no documents or notes reflecting any interviews for that time period, and that her trial testimony does not reference sending out resumes, signing up with a headhunter, or registering for unemployment. Defendants also point out that Kennedy claimed to be working with a headhunter named Mark Fischer at her deposition, but could not provide any details about him. However, Kennedy testified at trial that she looked through newspapers, talked to friends and family, and looked on the Internet in order to find a job. Kennedy's deposition provided more thorough testimony regarding her search, and included testimony that she had posted her resume online, sent out resumes online, and had interviews in 1999 and 2001. Additionally, Defendants offered the transcript of a voice mail message with Kennedy's voice at trial, in which Kennedy asked Mandera for a job.

The cases cited by Defendants either do not stand for the propositions asserted or do not necessitate that this Court find that Kennedy failed to undertake a reasonably diligent search for an equivalent job. Unlike the plaintiffs in *Chisholm v. Foothill Capital Corp.*, 3 F.Supp. 2d 925 (N.D. Ill. 1998), *Meyer v. United Air Lines, Inc.*, 950 F.Supp. 874, 876 (N.D. Ill. 1997), and *Williams v.*

*Imperial Eastman Acquisition Corp.*, 994 F.Supp. 926, 931-32 (N.D. Ill. 1998), Kennedy did not engage in an activity inconsistent with looking for full-time work. Instead, she looked on the Internet, in newspapers, and talked to family and friends. *See Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir. 1986)("a diligent Title VII plaintiff . . . would at least check the want ads, register with employment agencies, and discuss job opportunities with friends and acquaintances"). Defendants make much of Kennedy's lack of success in finding a job, arguing that her failure to find a job indicates that she was not reasonably diligent in seeking one. Defendants also argue that Mandera's threat to Copello that she would never work in the industry again is not relevant to a consideration of Kennedy's diligence. To this Court, however, it appears to be relevant and to excuse, to at least some extent, Kennedy's lack of success. Mandera's threat shows that he is willing, and perceives himself to be able, to blackball a person opposing him. *See Wheeler,* 794 F.2d 1228. While this Court agrees with Defendants that Kennedy could have been more diligent in seeking work, she was reasonably so.

Defendants have also failed to meet their burden of persuasion regarding the availability of a comparable job. Defendants assert that this Court should adopt a presumption of availability where the plaintiff did little to no job searching. However, this Court has already determined that Kennedy's job search, excluding the period between 2002 and 2004, was reasonably diligent. Otherwise, Defendants offer no evidence whatsoever that comparable jobs existed,

except to point out that Copello obtained one and that Chicago is a large job market. Such evidence is insufficient.

### ii. Kennedy's Later Discovered Bad Acts

Defendants argue that Kennedy should not be awarded back pay because she lied on her employment application. If an employer discovers evidence of a plaintiff's misconduct during litigation, it may limit damages to the period before the discovery, if the employer can show (by a preponderance of the evidence) that the misconduct would have resulted in termination had the employer learned of it during employment. *Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999). Kennedy admitted at trial that she lied on her job application by claiming to have six, rather than three, years of air freight experience. Defendants, however, do nothing more than assert that Kennedy would have been fired had it discovered this falsehood, as "Custom's application made clear that misrepresentation such as those made by Kennedy would have been cause for termination." In order to carry their burden, Defendants must do more than merely reiterate their policy. *See Sheehan*, 173 F.3d at 1048 ("the inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not"). Defendants have shown merely that a decision to fire Kennedy based on this falsehood would have been justified, but not that they would have made it. *See id.*

### iii. Kennedy's Back Pay Calculation

Kennedy seeks a total of $296,143.00 in back pay, as follows:

|  | 10/20/1998 – 12/31/2001 | 1/1/2004 – 11/17/2006 |
|---|---|---|
| Lost Salary | $ 174,166.54 | $ 151,239.00 |
| Commission Loss | $  79,166.54 | $  68,739.00 |
| Car Allowance | $  26,000.00 | $  23,100.00 |
| Phone and Pager | $   1,518.10 | $   1,316.00 |
| 401(k) | $  13,177.00 | $  10,587.00 |
| Unpaid Salary | $   2,115.38 (last two weeks of work) | |

Having already found that Kennedy is entitled to back pay and denied Defendants' two defenses, this Court grants Kennedy the lost salary and unpaid car allowance (as a fringe benefit). *See* Section regarding Copello above.

Defendants argue that Kennedy's sought commission loss is unduly speculative and should therefore be denied. Kennedy seeks a $25,000 commission per year. Kennedy's contract shows that she was to be paid at a rate of $55,000 per year, and that she was eligible for a monthly commission, dependent upon her performance. While with Custom, Kennedy made no sales, generated no revenue, and therefore, received no commission. While Kennedy correctly asserts that exactness in back pay awards is neither expected nor required, and that "ambiguities . . . should be resolved against the employer," *Steward*, 542 F.2d at 452; *see also, Horn,* 755 F.2d at 606, she appears to have drawn this $25,000 figure out of whole cloth. Based

on the commission program outlined in her contract (or rather this Court's best interpretation of that program, as it is not clear), Kennedy was eligible for a maximum of $1,937.50 in commission monthly, or $23,250 per year (assuming she sold $250,000 of LTL and Air Freight combined monthly and $160,000 TL and Local Cartage combined monthly). Although this Court is uncomfortable giving Defendants a windfall, any commission award would be unduly speculative. Kennedy provides no information as to sales figures of other Custom salesmen or even her own sales at her prior employment. *See Ungar v. Consolidated Foods Corp.*, 657 F.2d 909, 918-19 (7th Cir. 1981)(vacated on other grounds)(plaintiff provided court with her successor's sales record and her own previous record); *see also Felts v. Radio Distributing Co.*, 637 F.Supp. 234, 236 (N.D. Ind. 1985)(court must look to plaintiff's prior sales record to determine commission). Although this Court must resolve any ambiguity in Kennedy's favor, any estimate of a commission figure based on the information provided by Kennedy would be unduly speculative, especially given the "highly speculative and personal nature of sales." *See id.* As such, this Court will award Kennedy no commission.

As with the commission, this Court believes that a 401(k) contribution award would be unduly speculative. Kennedy indicates in her affidavit that she was eligible for 401(k) contributions up to 7% of her salary; this Court assumes that she means that Custom had agreed to match her contributions up to that amount. Kennedy has

provided no evidence that she made any contributions to a 401(k) while employed at Custom, or that she had done so in her previous position. *See Inks v. Healthcare Distributors of Indiana, Inc.*, 901 F.Supp. 1403 (N.D. Ind. 1995); *see Webber v. International Paper Co.*, 307 F.Supp.2d 119, 128 n.6 (D.Me. 2004) (court refused to award 401(k) contributions as back pay because plaintiff was not contributing to 401(k) account at time of termination). As such, this Court will not order 401(k) contributions as back pay.

This Court also will not award Kennedy back pay for the loss of the Nextel phone and pager. The phone and pager were for business use and were not fringe benefits. As such, such amounts are not recoverable as back pay.

Lastly, this Court will not award Kennedy $2,115.38 in unpaid salary. Kennedy provides no evidence that this amount was not paid (except for a letter requesting those amounts), and Custom has provided its payroll records, indicating that it was, in fact, paid.

This Court awards Kennedy $205,073.23 ($217,755.54 in lost pay and car allowance less $12,682.31 in maternity leave).

### 2. Front Pay

Title VII permits a court to "order such affirmative action as may be appropriate, which may include . . . reinstatement or hiring of employees . . . or any other equitable relief as the court deems appropriate. 42 U.S.C. § 2000e-5(g)(1). Front pay is "a monetary award equal to the gain [the plaintiff] would have obtained if reinstated" and is designed to monetize the value of the lost

opportunity to be reinstated.  *Williams v. Pharmacia, Inc.*, 137 F.3d 944 (7th Cir. 1998); *Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 332 (7th Cir. 1993).  Front pay is measured by the difference between what the plaintiff would have earned in the future had they been reinstated at the time of trial and what they would have earned in the future in their next best employment, and is calculated in a manner similar to back pay.  *Avita v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1231 (7th Cir. 1995); *Wattleton v. International Brotherhood of Boiler Makers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No. 1509*, 686 F.2d 586 (7th Cir. 1982).  Front pay is "not intended to assure a plaintiff's future financial success" and should extend only to the date upon which "the sting" of discriminatory conduct has ended. *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371-72 (7th Cir. 1992).  Thus, when calculating front pay, a court should terminate its inquiry at the point at which the plaintiff "can reasonably be expected to have moved on to similar or superior employment." *Williams*, 137 F.3d at 954.  A decision to award front pay is within the discretion of the district court.  *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111 (7th Cir. 1986) at 118.

### a.  Reinstatement

Because front pay is available only as an alternative remedy to reinstatement, this Court must consider whether reinstatement is appropriate in this case. "The equitable remedy of reinstatement requires the court to strike a delicate balance." *Bruso*, 239 F.3d

848, 861.  While reinstatement is the "preferred remedy for victims of discrimination," and should be awarded when feasible, a court need not reinstate a plaintiff where the result would be "a working relationship fraught with hostility and friction."  *Id.*  Where the working relationship would be fraught with hostility, reinstatement could "potentially cause the court to become embroiled in each and every employment dispute that arose between the plaintiff and the employer."  *Id.* at 861-62.  A court must not, however, base its decision not to order reinstatement on the employer's anger or hostility toward the plaintiff merely for having filed the suit.  *Id.* at 862.  Thus, a court must identify the source of the friction – a straightforward task when there was no evidence of friction before the plaintiff filed suit.  *Id.*  However, reinstatement is "particularly infeasible" if the plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated.  *Id.* Reinstatement is also problematic when the plaintiff would be supervised by the same individuals who discriminated against him in the first place.  *Id.*  Plaintiff-Intervenors argue that reinstatement would be inappropriate in this case because the relationship between Defendants and Plaintiff-Intervenors is fraught with hostility. Defendants, however, argue that there is no hostility, and that Plaintiff-Intervenors should be reinstated.

Reinstatement is infeasible.  There is copious evidence in the record that hostility between Custom and Plaintiff-Intervenors began before they had filed suit.  Before Copello sued, she was subjected

to consistent sexual banter, prying questions of a sexual nature, and events featuring scantily-clad adult entertainers. When Copello complained of sexual harassment on Kennedy's behalf, Kennedy was fired. Defendants took accounts away from Copello because she refused to entertain "in the Custom way" and refused to give her timely quotes for her customers after she complained about Defendants' sexual questions. Before Kennedy sued, she was fired the day after Copello complained of sexual harassment on her behalf. Kennedy was subjected to the same sexually-charged environment as Copello. Many of the employees who harassed Plaintiff-Intervenors or who allowed the harassment to continue are still employed by Defendants; in fact, Wiszowaty has since been promoted to Sales Manager and would therefore have direct authority over the Plaintiff-Intervenors were they to be reinstated. After the Plaintiff-Intervenors brought suit, Mandera threatened that they would never work in the industry again; Defendants refused to rehire Copello when she asked for a job in 2000. Additionally, Defendants testified at trial that neither woman's performance on the job was satisfactory. Although the jury found the Plaintiff-Intervenors' testimony to be more credible, the Defendants' testimony indicates that the Plaintiff-Intervenors would not have the respect and confidence of the Defendants if they were reinstated.

### b. Copello

Copello seeks $1,740 in front pay, representing six years of lost 401(k) contributions by Custom. (Copello initially sought a

front pay award of $18,900, which she claimed accounted for lost 401(k) contributions over six years. When Copello corrected her 401(k) contribution back pay claim in response to this Court's request for more information, she failed to correct her front pay claim. This Court assumes that the resulting inconsistency was an oversight, and assumes that she means to claim front pay in the amount of $1,740 based on Custom's $290 contribution in 2000 for six years.) Copello contends that she receives no 401(k) contributions from her current employer. As an initial matter, lost 401(k) contributions are recoverable as front pay. *See Mattenson v. Baxter Healthcare Corp.*, 2004 WL 1244016 (N.D. Ill. June 4, 2004). Copello's period extends well beyond the point where the "sting" of discrimination had ceased – the point where she was in fact making more money in a different, but comparable job. While this job does not provide 401(k) benefits, her increased salary arguably makes up for this loss. The parties agree that Copello made more money in a new job as early as 2001. Additionally, this Court notes that Copello has already been compensated for the loss of her 401(k) contributions, as she was awarded such losses in her back pay award. As such, this Court, in its discretion, denies Copello front pay.

### c. Kennedy

Kennedy seeks a front pay award of $320,000, or the equivalent of four years at a salary of $80,000. Defendants contend that Kennedy should receive no front pay because she failed to search for a job. Although this Court held that Kennedy was reasonably diligent

in her job search for purposes of the back pay determination, this Court is reluctant to also award Kennedy front pay for four years where she has conducted only the barest minimum search as required to recover. It concerns this Court greatly that Kennedy *still* has been unable to find a job; Kennedy does not appear to be unemployable and Copello was able to find a job despite Mandera's threats. Kennedy, furthermore, has already been compensated for the loss of her job at Custom. *See, Bennett v. Smith*, 2001 WL 717490 at *2 (N.D. Ill. June 26, 2001)(denying front pay in court's discretion in part because the back pay award fully compensated plaintiff). As such, this Court denies Kennedy front pay in its discretion.

### III.  INJUNCTIVE RELIEF

The EEOC and Plaintiff-Intervenors request various forms of injunctive relief. Defendants, predictably, argue that injunctive relief is not warranted.

### A.  Injunctive Relief is Warranted

Title VII specifically provides for injunctive relief 42 U.S.C. § 2000e-5(g)(1). Such relief is authorized "once the court has found that the defendant intentionally engaged in an unlawful employment practice." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1996). A prevailing plaintiff need not make a special showing to obtain injunctive relief, and specifically need not demonstrate that the employer engages in a pattern or practice of discrimination. *Bruso*, 239 F.3d 848, 864. Instead, the proper inquiry is whether the defendant's "discriminatory conduct could

possibly persist in the future." *Id.* This Court believes that injunctive relief is appropriate here. Copello and Kennedy persuaded the jury that they were the victims of sexual harassment and retaliatory termination. Fritkin persuaded the jury that she was likewise a victim of retaliation. Additionally, circumstances indicate that Defendants might engage in sexual harassment in the future. The sexual harassment was carried out by several individuals still employed by Defendants, including Wiszowaty and Kolzow. Mandera, Klonowski, and Boyle, all still in upper management positions, failed to stop the harassment. The President and owner of the company, Mandera, was even involved in the retaliation. The mere fact that Defendants have, and at all times had, written policies addressing sex harassment and retaliation does not demonstrate that injunctive relief is inappropriate, as these policies have been ignored. *See Bruso*, 239 F.3d at 864 ("if United's upper echelon of management felt free to ignore United's policies in the past, there is no reason to believe that those same members of management will abide by them in the future"). Lastly, Defendants have not accepted responsibility for the violations that occurred, but have bitterly contested every issue in this suit.

## B.  Specific Injunctive Relief Ordered

Plaintiffs request various injunctive relief measures to prevent future sexual harassment and retaliation. This Court grants the bulk of these measures by enjoining Defendants for a period of four years: (1) from violating Title VII with respect to sexual harassment and

retaliation; (2) to post a notice informing its employees of the verdict and injunction in this suit and of the employees' right to contact the EEOC without fear of retaliation; (3) to provide the EEOC notice (including a description of the complaint, the investigation conducted, and the result) of any complaint of sexual harassment or retaliation within thirty days from the date the complaint was made; (4) to provide a report to the EEOC every six months detailing all complaints made and listing all individuals terminated by Defendants; (5) to provide written confirmation to every employee that any complaint of harassment or retaliation received by any manager will be taken seriously and investigated; (6) to require each of Defendants' officers, managers, supervisors, and employees to attend a Title VII training seminar on sex harassment, Title VII principles, and retaliation on a yearly basis (sponsored by a group unrelated to any of the law firms that have represented the Defendants); (7) from threatening and participating directly or indirectly in precluding Plaintiff-Intervenors from obtaining work in the freight industry; (8) to expunge from the Plaintiff=Intervenors' personnel files all references to this lawsuit or the investigations of any complaints or charges of sexual harassment or retaliation; and (9) to provide a notice to all Defendants' customers advising them of the jury verdict, the Court's judgment, and reaffirming the Defendants' commitment to equal employment opportunity in the workplace. The Court believes that by granting these injunctions, the Defendants will be prevented from continuing to violate Title VII.

Additional relief not granted includes enjoining the Defendants to (1) submit periodic monitoring reports to the Plaintiff-Intervenors; and (2) reimburse Plaintiff-Intervenors and their attorneys for their fees and costs associated with monitoring the Defendants' reports and compliance with this Court's injunction. The Court believes that this relief will not measurably contribute to preventing the Defendants from engaging in further Title VII violations, especially considering that the EEOC will already be closely monitoring the situation.

### 1. Adult Entertainment and the Crazy Horse

Plaintiffs request that this Court grant an injunction preventing Defendants from (1) sponsoring any company event at a place of adult entertainment or which includes adult entertainers; (2) providing for or reimbursing customer entertainment at adult entertainment establishments; and requiring (3) that the Defendants distribute to their customers a notice advising them that Defendants will no longer provide adult entertainment for clients. Plaintiffs argue that this injunction is necessary to prevent Defendants from retaliating against sales personnel who refuse to entertain clients at such establishments. This Court believes that enjoining Defendants from entertaining clients at places of adult entertainment is too broad. Instead, this Court enjoins Defendants from sponsoring company events at a place of adult entertainment. Defendants are further enjoined from reimbursing sales personnel for costs incurred while entertaining clients at adult entertainment establishments

which are owned or operated by Defendants and Defendants' owners, officers, and directors.  This measure is intended to decrease the current financial incentive for entertaining clients at the Crazy Horse.  The Court does not grant an injunction requiring Defendants to inform clients that they will no longer provide entertainment at adult entertainment establishments.

### 2. The State Court Lawsuit

Lastly, the EEOC seeks an injunction requiring Custom to withdraw its retaliatory lawsuit against Fritkin.  The EEOC argues that such an injunction is necessary to prevent further retaliation against Fritkin, and that the jury found that the suit was retaliatory.  This Court has already upheld the jury's verdict and refused to grant judgment as a matter of law as to Fritkin's retaliation claim.

Defendants, however, argue that such an injunction would run afoul of the Anti-Injunction Act, 28 U.S.C. § 2283.  The Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court, except as expressly authorized by an Act of Congress or where necessary in and of its jurisdiction or to protect or effectuate its judgments."  There is, however, an exemption where the "plaintiff in the federal court is the United States itself, or a federal agency asserting 'superior federal interest.'"  *See, Levi Strauss*, 515 F.Supp at 642 (citing *Mitchum v. Foster*, 407 U.S. 225, 235-236 (1971)).  As such, the Act does not bar the injunction sought by the EEOC as "the interests represented by

the Commission are, in effect, defeated if a retaliatory state court . . . action is allowed to proceed." *See id.* at 642-43. Even if this exception did not apply, this Court agrees with *Levi Strauss* that an exception to the reach of the Act, analogous to that articulated in *Mitchum* would apply. *See id.* at 642-43.

Defendants argue, however, that *Levi Strauss* is inapposite because the state court suit does not allege defamation and is not otherwise related to Fritkin's allegations of sexual harassment. While Defendants are correct that the *Levi Strauss* suit alleged defamation based on the very allegations made by the plaintiff in the Title VII action, this difference is unimportant. Regardless of the nature of the state court suit against Fritkin, the jury determined that it was retaliatory in purpose and thus, an injunction is necessary to prevent further retaliation in the form of finally obtaining a state court judgment against Fritkin. The cases Defendants cite in favor of caution in enjoining the state court action are inapposite. This Court, furthermore, is being cautious; it merely believes that injunctive relief is warranted in this case.

## IV. <u>DEFENDANT'S MOTION FOR ATTORNEY'S FEES</u>

Without reaching the merits of the motion, this Court strikes Defendant's Motion for Attorney's Fees as a Prevailing Party. Although a prevailing defendant may be awarded attorneys' fees (upon a finding that the plaintiff's action was "frivolous, unreasonable, or without foundation"), Local Rule 54.3 sets for a procedure for a fee motion seeking "any award of attorneys' fees." That Rule

provides that a motion for attorney's fees must be filed within 90 days after entry of judgment or settlement; judgment has not yet been entered in this case. Additionally, before a motion for fees may be filed, the movant must provide the opposing party with information regarding hourly rates and time sheets reflecting the fees to be requested, the parties must confer and attempt to agree on an amount of fees to be awarded, and the parties must file a joint statement outlining any remaining disputes. Local Rule 54.3. Defendants have made no attempt to comply with the procedure set out by Local Rule 54.3, and thus, its motion for attorney's fees as a prevailing party is stricken as premature.

Defendants' motion in opposition to attorneys' fees being granted to Plaintiff-Intervenors is likewise premature. Plaintiff-Intervenors have, as of yet, filed no motion for attorneys' fees; if (or when) they do, Defendant may raise its objections to such an award when it confers with Plaintiff-Intervenors and in the subsequent joint statement.

## V. <u>CONCLUSION</u>

For the reasons stated herein, the following motions are granted:

1. Plaintiffs' Motion for a Finding that Defendants Employed Two Hundred Employees (in part);

2. Defendants' Motion Concerning the Number of Defendants' Employees (in part);

3.    Plaintiff-Intervenors' Motion for Back and Front Pay (in part);

4.    EEOC's Motion for Injunctive Relief (in part);

5.    Plaintiff-Intervenors' Motion for Injunctive Relief (in part); and

6.    Defendants' Motion to Reduce Fritkin's Attorney's Fees Award.

The following motions are denied:

1.    Defendants' Motion for Directed Verdict in Favor of CEG;

2.    Defendants' Motion to Reduce Compensatory Damages to Nominal Damages;

3.    Defendants' Motion to Reduce Punitive Damages as Excessive;

4.    Defendants' Motion to Deny Back and Front Pay;

5.    Defendants' Motion Against Granting an Injunction;

6.    Defendants' Motion for Attorney's Fees; and

7.    Defendants' Motion Against Awarding Fees to Plaintiff-Intervenors.

The Court enters Judgment against Defendants Custom Companies Inc. and Custom Executive Group in the amount of $1,135,168.23, broken down as specified above.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:    3/8/2007